19 F.3d 1433
 5 NDLR P 87
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Jack B. KLEIN; Jack B. Klein, Executor of the Estate of
Carol Ann Klein, Deceased, Plaintiffs-Appellants,
v.
MANOR HEALTHCARE CORPORATION, Jerry Cangelosi, Rob Vadis,
Wanda I. Cordero, Defendants-Appellees.
 Nos. 92-4328, 92-4347.
 United States Court of Appeals, Sixth Circuit.
 March 22, 1994.
 
 Before: KENNEDY and GUY, Circuit Judges; and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 In this handicap discrimination case, plaintiff appeals the decision of the district court granting defendants' motion for summary judgment. On appeal, plaintiff argues that genuine issues of material fact exist as to whether defendants' conduct constitutes handicap discrimination within the meaning of the operative federal and state statutes. Plaintiff further argues that the district court erred by allowing defendants to amend their removal petition and by granting defendants' motion to strike certain evidentiary material. For the following reasons, we affirm.
 
 I.
 
 2
 In 1986, Carol Klein was diagnosed with colon cancer. She received surgical treatment for her cancer and appeared to be well on her way to recovery. In 1987, Mrs. Klein, a licensed physical therapist ("LPT"), began her employment with Manor Healthcare Corporation ("Manor Care") in Euclid, Ohio, as the Director of Rehabilitative Services/Physical Therapy at Manor Care's Lakeshore facility. In her application, she revealed that she had had cancer, but that she felt the surgery had cured her.
 
 
 3
 Unfortunately, her bout with cancer would resume in 1988, when it was discovered that the cancer had metastasized to her brain and lung. Again, she underwent surgery, which necessitated an extended leave of absence from her job with Manor Care. Although not fully recovered, she returned to work six months later. The illness had caused some weight and vision loss, and she was taking Dilantin, an anti-seizure medication. Despite her difficulties, it appears she competently discharged her duties with Manor Care through 1989.
 
 
 4
 In early 1990, Wanda Cordero became the administrator of the Lakeshore facility. This, at least according to Mrs. Klein's husband, Jack Klein ("plaintiff"), would mark the beginning of the end for Mrs. Klein's relationship with Manor Care. In the aftermath of Cordero's arrival, Mrs. Klein felt that her views were being ignored by the staff. Furthermore, plaintiff claims Cordero was not particularly receptive to his wife's request for assistance. As Cordero would later testify:
 
 
 5
 I spoke to Carol Klein in the physical therapy department. At this time she stated to me that, quote, she was overwhelmed with the paperwork, end quote. I asked her what we could do, what we could do, she stated she did not have an assistant. At this time I told her I could have Mimi Preisler or Terri [Steirer] here to help her.
 
 
 6
 (App. 724.)
 
 
 7
 Cordero claims to have followed through on her promise. Initially, she assigned Preisler, an LPT, to assist Mrs. Klein while she regained her strength. Two other Manor Care employees, Agnes Puro and Dawn Geiser, took over for Preisler once Mrs. Klein returned to her normal duties. While Puro and Geiser were assisting Mrs. Klein, Preisler and her administrative assistant, Steirer, were also made available to her on an as needed basis.
 
 
 8
 The adequacy of the assistance provided to Mrs. Klein by Cordero is a matter of some dispute. In support of his assertion that Mrs. Klein was in need of more assistance than was actually provided by Manor Care, plaintiff notes that Manor Care, following Mrs. Klein's first performance review, made it a "30-day objective" to recruit a licensed physical therapy assistant ("LPTA") to help her. In plaintiff's estimation, this indicates Manor Care's recognition of the fact that "even a healthy, normal, not handicapped person, such as Carol then was, could not treat patients, prepare charts and all paperwork for the State Examiner, Medicare and Medicaid, bill private insurance companies, as well as supervise her department all on her own."
 
 
 9
 Plaintiff also observes that of the people assigned to assist his wife, only one, Preisler, was an LPT. As he explains: "[U]nlicensed help was of very little practical benefit to Carol because unlicensed help lacked the educational and skill level as well as the statutory authorization to give Carol both quantitatively and qualitatively the level of assistance that she needed." Plaintiff further contends that even Preisler did little to ease Mrs. Klein's day-to-day burdens. In fact, plaintiff maintains that, far from providing assistance, "[t]he main purpose of [Preisler's] presence in Carol's department would seem to be so that Mimi Preisler could observe and report on Carol for ... Cordero since [Preisler] was instructed by ... Cordero 'to evaluate the situation ' [in the department]."[1]
 
 
 10
 Irrespective of Preisler's true motives, one thing was for certain: Mrs. Klein was not her old self. Asked to detail the problems Mrs. Klein was experiencing, Cordero responded:
 
 
 11
 Well, there were several concerns, particularly in [regard] to memory, recalling a resident's name that she was taking care of. She was overwhelmed. What we would consider normal documentation having to rewrite things over and over again, not completing things, having seizures in the department, coughing up blood, not knowing what treatments she was doing on residents.
 
 
 12
 (App. 663; emphasis added.) In addition, Mrs. Klein began to behave erratically. On one occasion, believing that someone had stolen money from her locker, she erupted into a tirade, slamming doors and yelling in anger. Although no evidence was ever uncovered to substantiate her belief, her emotional outburst continued for two days.[2] Not surprisingly, her bahavior was regarded as inappropriate for a nursing home.
 
 
 13
 In an attempt to address problems with Mrs. Klein's performance, a meeting was held in September of 1990.[3] Attending the meeting were: Mrs. Klein; Cordero; Rob Vadis, Cordero's supervisor; and Jerry Cangelosi, Manor Care's human resources manager. As a result of this meeting, Mrs. Klein resigned from her position with Manor Care, although exactly what prompted her decision is disputed. According to plaintiff, during the meeting "Carol was told she must resign or probably be terminated because her work performance was substandard[.]" The Manor Care representatives provide a somewhat different account of what took place during the meeting: "Although there was no request for her to resign, the subject was discussed and Mrs. Klein resigned."
 
 
 14
 Mrs. Klein finally succumbed to cancer in May 1991. The instant action was initiated on September 9, 1991, when plaintiff, individually and as executor of his wife's estate, filed a ten-count complaint in Ohio state court. Named as defendants were Manor Care, Cangelosi, Vadis, and Cordero. In addition to alleging various state claims,[4] plaintiff sued defendants for wrongful termination pursuant to sections 4112.02(A) and (J) of the Ohio Revised Code, and for handicap discrimination pursuant to section 504 of the Rehabilitation Act, 29 U.S.C. Sec. 794.
 
 
 15
 On October 8, 1991, defendants Manor Care, Cangelosi, and Cordero filed a petition removing this matter to federal district court.[5] Defendant Vadis did not join in the petition due to the fact that he had not yet been served. On October 29, plaintiff, noting that defendants' petition had not explained Vadis's failure to join, moved for the case to be remanded to state court.[6] Plaintiff's motion was denied by the district court in an order dated November 21, 1992. The court reasoned:
 
 
 16
 Removal in this case is predicated on the assertion of the federal handicap claim. Such a claim can only be asserted against the employer which in this case joined in the removal petition. Under such a scenario, only the defendants subject to the federal claim need sign the petition for removal.
 
 
 17
 (App. 30.)
 
 
 18
 Subsequently, plaintiff twice moved for reconsideration of the November 21 order. Although the court did grant the second such motion, it permitted defendants to amend their removal petition to explain Vadis's non-joinder.[7] In deciding against remand once again, the court merely stated that "[a]fter the thirty days [from the defendants' receipt of plaintiff's state court complaint] has passed, it is still permissible for a party, granted leave, to amend its petition to correct any defects." (Id. at 35; citations omitted.) The court did not reassert its earlier contention that only Manor Care's signature was needed to secure removal of the instant action.
 
 
 19
 On September 11, 1992, defendants filed a joint motion for summary judgment with respect to each of the claims listed in plaintiff's complaint. Plaintiff countered by filing a motion for partial summary judgment (pertaining to the state and federal handicap claims) three days later. On September 21, 1992, defendants moved to strike certain materials accompanying plaintiff's summary judgment motion. Defendants asserted that these materials were contrary to Rule 56 of the Federal Rules of Civil Procedure.
 
 
 20
 On November 6, 1992, the district court granted both defendants' summary judgment motion and the motion to strike. Plaintiff's timely appeal followed.
 
 II.
 
 21
 On appeal, plaintiff first argues that the district court erred in permitting defendants to amend their removal petition to explain defendant Vadis's initial failure to join the petition.[8] This court reviews denials of remand motions under a de novo standard. Her Majesty the Queen in Right of the Province of Ontario v. City of Detroit, 874 F.2d 332, 338 (6th Cir.1989). Plaintiff maintains that "remand to state court is required where (as here) a resident defendant has not been joined in the Notice of Removal and that Notice fails to allege the non-joining, resident defendant was not served in the state court proceeding." Moreover, plaintiff claims, defendants should not have been allowed to cure their defective petition beyond the thirty-day removal period provided by 28 U.S.C. Sec. 1446(b).
 
 
 22
 Plaintiff cites numerous district court decisions to bolster his argument. E.g., Howard v. George, 395 F.Supp. 1079 (S.D.Ohio 1975); Walsh v. American Airlines, Inc., 264 F.Supp. 514 (E.D.Ky.1967); Gratz v. Murchison, 130 F.Supp. 709 (D.Del.1955). For the most part, however, these decisions predate a developing line of cases within this circuit that severely undermines plaintiff's position. In recent years, this court has expressed a reluctance to interpret statutory removal provisions in a grudging and rigid manner, preferring instead to read them in a light of more consonant with a modern understanding of pleading practices. See Tech Hills II Assocs. v. Phoenix Home Life Mut. Ins. Co., 5 F.3d 963 (6th Cir.1993) (holding that defendant was properly granted leave to amend its removal petition to cure defect in allegation of diversity of citizenship, even though thirty-day period under 28 U.S.C. Sec. 1446(b) had expired); Gafford v. General Elec. Co., 997 F.2d 150 (6th Cir.1993) (same); see also Stanley Elec. Contractors, Inc. v. Darin & Armstrong Co., 486 F.Supp. 769 (E.D.Ky.1980) (same); Jackson v. Metropolitan Life Ins. Co., 433 F.Supp. 707 (E.D.Ky.1977) (same).
 
 
 23
 In Gafford, this court rejected the plaintiff's argument that the district court never should have allowed removal because the defendant's petition did not state its principal place of business.[9] The Gafford court articulated the rationale underlying its liberalized approach to permitting amendments to removal petitions:
 
 
 24
 Better, if the jurisdiction in fact exists, to permit the petition for removal to be amended to reflect it. It appears that the time has come to reexamine this entire matter and expressly adopt the approach ... that amendments to the jurisdictional allegations of removal petitions should be permitted in the same manner as amendments to any other pleading.
 
 
 25
 ....
 
 
 26
 It must be made clear that this opinion is not to be construed as departing in any way from the precept that the facts giving rise to federal jurisdiction must be strictly construed and alleged with particularity. The decision holds only that the time has come to apply the principles of modern pleading relating to amendments to removal petitions, and that amendments should be permitted, to implement the spirit of the statute and rules cited herein, where the jurisdictional facts do indeed exist, and the parties are in law entitled to invoke the jurisdiction of the federal court.
 
 
 27
 ....
 
 
 28
 Virtually all of the commentators and the great weight of judicial authority favor the rule adopted by this decision. Indeed, the strict view reflected by the earlier cases hereinabove cited has been expressly criticized.
 
 
 29
 For the above reasons, the court holds that a petition for removal may be amended under the same considerations governing the amendment of any other pleading containing jurisdictional allegations.
 
 
 30
 997 F.2d at 164 (quoting Stanley, 486 F.Supp. at 772-73); see also Tech Hills, 5 F.3d at 969. Furthermore, as the Stanley court noted:
 
 
 31
 Not only does the technical construction in effect in days past cause serious adverse effects to attorneys and parties rightfully entitled to invoke the jurisdiction of the federal courts, but in some cases great and needless waste of judicial time and effort, real prejudice to the parties, and severe injustice results. For example, in Roseberry v. Fredell [174 F.Supp. 937 (E.D.Ky.1959) ], the trial was concluded when the losing party pointed out a technical defect in the removal petition, with the result that the cause had to be remanded to the state court for a retrial. In the instant case, substantial proceedings have occurred, including the payment into court of a large sum.
 
 
 32
 486 F.Supp. at 773 (footnote omitted).
 
 
 33
 Although Gafford and Stanley both involved a jurisdictional deficiency (i.e., failure to adequately state grounds for diversity jurisdiction) in a defendant's removal petition, we think the reasoning of both courts is equally relevant in the context of an alleged procedural deficiency (i.e., failure to include all defendants in a removal petition). Here, the parties did not dispute that the district court could, pursuant to a properly-drafted removal petition, exercise federal question jurisdiction over plaintiff's action; the only question was whether the failure to strictly comply initially with the niceties of the removal procedures could prevent the court from doing so. To preclude federal jurisdiction in this instance, we feel, would contravene the spirit of the more recent case law on the subject. We decline to so hold, and, accordingly, we reject plaintiff's argument founded on defendants' failure to initially explain Vadis's failure to join in his co-defendants' removal petition.
 
 III.
 
 34
 Next, plaintiff challenges the district court's grant of defendants' motion to strike certain evidence submitted by plaintiff in support of his motion for partial summary judgment. The evidentiary material the court excluded includes tape recorded phone conversations between plaintiff and the decedent, and the decedent and her attorney. Through these recordings, plaintiff had hoped to demonstrate the decedent's poor physical condition, the enormity of her workload, her desire to have the assistance of an LPTA, and the fact that Manor Care and some of its administrators were "spying" on her. Also excluded was plaintiff's deposition testimony, in which he recounted conversations he allegedly had with the decedent regarding her job and working conditions. Finally, the court excluded certain documents, including letters from doctors and medical reports.
 
 
 35
 With regard to the recorded conversations, the district court deemed them to be inadmissible hearsay not falling under a recognized exception to the hearsay rule. Specifically, the court concluded that Rule 803(1) of the Federal Rules of Evidence (present sense impression) was inapplicable because, as it explained: "Clearly, the decedent did not describe any particular event which evidenced handicapped discrimination in the tapes, and certainly was not perceiving any such event as she spoke." (App. 44.) The court also found Rule 803(3) (then existing mental, emotional, or physical condition) inapposite because it found the decedent's then-existing mental or emotional condition irrelevant to the issue of defendants' liability. It stated: "The mere fact that someone is unhappy at work, that they do not feel that they get the recognition they deserve or that the fact that they do not like their superior does not give rise to any claim for relief." (Id.)
 
 
 36
 The court used similar reasoning in excluding plaintiff's deposition testimony. This evidence, too, the court concluded was inadmissible hearsay. In particular, the court noted that "[w]hile Rule 804(2) excepts statements under belief of impending death, decedent's statements do not qualify because the statements do not go to the cause of her death." (Id. at 45; citation omitted.) As to plaintiff's documentary evidence, the court observed that under Rule 56(e) of the Federal Rules of Civil Procedure, "all documents accompanying a motion for summary judgment must be sworn or certified." (Id. at 46; citations omitted.) The court proceeded to strike the documents from plaintiff's summary judgment motion due to the fact that they had not been properly authenticated.
 
 
 37
 Plaintiff now disputes the court's hearsay determinations and maintains that all of the evidence in question was, indeed, properly authenticated.[10] Plaintiff's task on appeal is not an easy one. "We review admission of testimony and other evidence by the trial court under the abuse of discretion standard." Mitroff v. Xomox Corp., 797 F.2d 271, 275 (6th Cir.1986) (citations omitted). An abuse of discretion occurs when the appellate court is "firmly convinced that a mistake has been made." United States v. Phillips, 888 F.2d 38, 40 (6th Cir.1989) (citation omitted).
 
 
 38
 Here, plaintiff has not overcome his heavy burden. Although we do not feel that the district court abused its discretion in making the challenged evidentiary rulings, we need not reach this conclusion to affirm the court's grant of summary judgment. In short, even had the district court considered the disputed evidence, such evidence would not have raised a genuine issue of material fact precluding the issuance of summary judgment in defendants' favor.
 
 IV.
 
 39
 Finally, plaintiff contends that the district court erred in granting defendants' summary judgment motion as to his substantive federal and state claims. We review de novo a district court's grant of summary judgment. EEOC v. University of Detroit, 904 F.2d 331, 334 (6th Cir.1990). We examine the grant of summary judgment to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Booker v. Brown & Williamson Tobacco Co., 879 F.2d 1304, 1310 (6th Cir.1989) (citation omitted). Although we must draw all justifiable inferences in favor of the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), there must be a disagreement regarding an item of material fact. Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir.1986). The evidence presented must be sufficient to permit the plaintiff to recover if accepted by the jury.
 
 A.
 
 40
 Plaintiff's federal claim is premised upon section 504 of the Rehabilitation Act, which provides in relevant part:
 
 
 41
 No otherwise qualified individual with a disability in the United States, as defined in section 706(8) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.
 
 
 42
 29 U.S.C. Sec. 794(a). As this court stated in Pesterfield v. Tennessee Valley Authority:
 
 
 43
 In order to establish a prima facie case under the [Rehabilitation] Act, the plaintiff must allege and prove (1) that he is a "handicapped person" under the Act, (2) that he is "otherwise qualified" for the position sought, (3) that he was excluded from the position "solely by reason of his handicap," and (4) that the position was part of a program or activity [receiving federal financial assistance.]"
 
 
 44
 941 F.2d 437, 441 (6th Cir.1991) (citing, inter alia, Southeastern Community College v. Davis, 442 U.S. 397, 406 (1979)).
 
 
 45
 The dispute in the instant case centers around the third prong of the above analysis, namely, whether the decedent is entitled to relief as an "otherwise qualified" handicapped person under the Rehabilitation Act. To resolve this question, we must determine whether the decedent was, in fact, "otherwise qualified" within the meaning of the Act. In School Board of Nassau County v. Arline, the Supreme Court instructed:
 
 
 46
 In the employment context, an otherwise qualified person is one who can perform "the essential functions" of the job in question. When a handicapped person is not able to perform the essential functions of the job, the court must also consider whether any "reasonable accommodation" by the employer would enable the handicapped person to perform those functions.
 
 
 47
 480 U.S. 273, 287 n. 17 (1987) (citation omitted); see also Jasany v. United States Postal Serv., 755 F.2d 1244, 1250 (6th Cir.1985) ("A 'qualified handicapped person' is one 'who, with or without reasonable accommodation, can perform the essential functions of the position in question.' ") (Citation omitted). Exactly what constitutes an essential function is a fact-specific inquiry that "should be based upon more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved." Hall v. United States Postal Serv., 857 F.2d 1073, 1079 (6th Cir.1988).
 
 
 48
 Here, the district court held that the decedent was not "otherwise qualified" for purposes of the Rehabilitation Act.[11] We agree and write further only to clarify that our decision rests primarily on an assessment of the decedent's compromised physical condition, not on an evaluation of defendants' conduct.[12] During the time leading up to her resignation from Manor Care, the decedent's ability to perform the essential functions of her job had diminished to the point where no reasonable amount of accommodation, either from full-fledged LPTAs or otherwise, could have compensated for her handicap.
 
 
 49
 Plaintiff challenges the district court's assessment of the decedent's mental and physical competence. As evidence that the decedent was in possession of her faculties, plaintiff cites the favorable review Manor Care's Medical Director gave to the department under the decedent's supervision. Plaintiff also notes that the department's billing was at a two-year high and that the decedent was able to secure further employment as an LPT for the period following her resignation and until six weeks before her death. Counterbalanced against this evidence--little of which speaks directly to the level of decedent's own performance--is the substantial evidence indicating that the decedent could no longer do the things LPTs do. In fact, she not only was ineffective but also had become hazardous to those under her charge. For those in the business of caring for the health and well-being of others, requesting assistance for completing paperwork is one thing; confusing patients and their treatments (as the decedent did) is something else entirely.
 
 B.
 
 50
 The district court's grant of defendants' summary judgment motion also disposed of plaintiff's state law claims. For instance, plaintiff sought relief for handicap discrimination under the applicable state statute. Ohio Revised Code Sec. 4112.02 provides in relevant part:
 
 
 51
 It shall be an unlawful discriminatory practice:
 
 
 52
 (A) For any employer, because of the ... handicap ... of any person, to discharge without just cause, to refuse to hire, or otherwise discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.
 
 The Ohio Code further provides:
 
 53
 (L) Nothing in divisions (A) to (E) of this section shall be construed to require a handicapped person to be employed or trained under circumstances that would significantly increase the occupational hazards affecting either the handicapped person, other employees, the general public, or the facilities in which the work is to be performed, or to require the employment or training of a handicapped person in a job that requires him routinely to undertake any task, the performance of which is substantially and inherently impaired by his handicap.
 
 
 54
 Ohio Rev.Code Sec. 4112.02(L).
 
 
 55
 This provision is fatal to plaintiff's claim on two counts. Not only has he offered insufficient evidence to demonstrate that the decedent was capable of performing tasks that were inherent and routine in her position, but she was, as stated above, a hazard to her workplace environment. Accordingly, plaintiff's claim based on Ohio's anti-discrimination statute must fail.
 
 
 56
 Plaintiff's remaining state law claims also were properly dismissed. We reject plaintiff's related claims of breach of an implied contract,[13] promissory estoppel,[14] and intentional and/or negligent misrepresentation/deceit.[15] These claims are based on the assumption that the decedent had, in fact, been discriminated against. In light of our conclusion to the contrary, plaintiff's claims are without merit. We are also unpersuaded by plaintiff's claim of intentional infliction of emotional distress.[16] Although we voice no opinion as to whether plaintiff or the decedent actually suffered serious emotional distress, we do note that defendants' conduct was neither extreme nor outrageous, and, therefore, cannot serve as the basis for recovery under this tort.
 
 
 57
 Finally, plaintiff charges defendants with unjust enrichment. Plaintiff maintains that defendants reaped the profits from a new therapy technique for burn patients developed by the decedent. Manor Care's profit sharing plan, plaintiff notes, allows employees to receive a percentage of profits earned from products or techniques they invent. As the district court pointed out, however, rather than developing the technique herself, the decedent had actually learned of it while attending a conference as a Manor Care representative. Upon returning from the conference, the decedent simply incorporated the technique into a therapeutic program. In other words, "[t]here is no evidence to suggest that decedent made any contribution to the development of the technique, itself." (App. 60.)
 
 
 58
 For the foregoing reasons, the decisions of the district court granting defendants' motion to strike and defendants' motion for summary judgment are AFFIRMED.
 
 
 
 [1]
 In short, plaintiff accuses Cordero and various other members of the Manor Care staff of "spying" on his wife. That these Manor Care officials would carefully monitor the quality of care being administered by Mrs. Klein's department, however, is not inconsistent with the nursing home's primary objective of ensuring the well-being of its residents
 
 
 [2]
 In support of his contention that his wife was still capable of providing a level of care consistent with Manor Care's standards, plaintiff cites a report issued by Dr. Lisa Meek, Manor Care's Medical Director. The report, dated September 1, 1990, gave a glowing review of her physical therapy department. Notwithstanding the fact that the report did not evaluate particular individuals, plaintiff argues that it represents an endorsement of his wife's performance because she was the only full-time LPT providing physical therapy services
 As further evidence of decedent's undiminished ability, plaintiff notes that she received special recognition from the Ohio Department of Health for developing a very successful high voltage wound and skin program.
 
 
 [3]
 For plaintiff, the timing of this meeting is significant:
 If Mimi Preisler ... could have been of real benefit to Carol, was indeed "assigned to help" Carol ... as opposed to being assigned to evaluate Carol and submit written evaluations on Carol's department's operation to ... Cordero ... that assignment was a weekly one and it only commenced on 8-30-90 four working days before the "Tribunal of 5" was convened and seven working days before Carol's forced resignation on 9-12-90.
 (Appellant's brief at 24) (Citations omitted; emphasis in original.)
 
 
 [4]
 These claims included: breach of implied contract (Count 3); promissory estoppel (Count 4); intentional and/or negligent misrepresentation/deceit (Count 5); unjust enrichment (Count 6); infliction of emotional distress (Count 7); bad faith (Count 8); loss of consortium/society (Count 9); and violation of public policy (Count 10)
 
 
 [5]
 Title 28 U.S.C. Sec. 1441(a) provides:
 Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending. For purposes of removal under this chapter, the citizenship of defendants sued under fictitious names shall be disregarded.
 
 
 [6]
 Title 28 U.S.C. Sec. 1447(c) provides in relevant part:
 A motion to remand the case on the basis of any defect in removal procedure must be made within 30 days after the filing of the notice of removal under section 1446(a). If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded. An order remanding the case may require payment of just costs and any actual expenses....
 
 
 [7]
 Plaintiff had also moved to certify the issue of whether a section 504 claim could be asserted against an employee (e.g., Vadis). The court denied this motion at the same time it granted plaintiff's motion for rehearing
 
 
 [8]
 Title 28 U.S.C. Sec. 1446 provides in relevant part:
 (a) A defendant or defendants desiring to remove any civil action or criminal prosecution from a State court shall file in the district court of the United States for the district and division within which such action is pending a notice of removal signed pursuant to Rule 11 of the Federal Rules of Civil Procedure and containing a short and plain statement of the grounds for removal, together with a copy of all process, pleadings, and orders served upon such defendant or defendants in such action.
 (b) The notice of removal of a civil action or proceeding shall be filed within thirty days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based, or within thirty days after the service of summons upon the defendant if such initial pleading has then been filed in court and is not required to be served on the defendant, whichever period is shorter.
 If the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order, or other paper from which it may first be ascertained that the case is one which is or has become removable, except that a case may not be removed on the basis of jurisdiction conferred by section 1332 of this title more than 1 year after commencement of the action.
 Historically, courts have strictly construed the procedural requirements of Sec. 1446. As the court in Courtney v. Benedetto explained:
 Courts have consistently construed 28 U.S.C. Sec. 1446(a) to require that all defendants either join the petition for removal or to consent to such removal. Furthermore, defendants mandated by 1446(a) to either join the petition for removal or to consent to such removal must do so within thirty (30) days of notice or service of process. The exceptions to the general rule that all defendants join or consent to the petition for removal exist when: (1) the non-joining defendant has not been served with service of process at the time the removal petition is filed; (2) the non-joining defendant is merely a nominal or formal party; and, (3) the removed claim is a separate and independent claim as defined by 28 U.S.C. Sec. 1441(c). A necessary corollary to 1446(a) which requires the petition for removal contain "a short and plain statement of the facts which entitle him or them to removal" is that the removal petition must set forth the reason why a defendant named in such action has not joined the petition for removal. A petition for removal filed by less than all defendants is considered defective if it does not contain an explanation for the non-joinder of those defendants.
 
 
 [627]
 F.Supp. 523, 525-26 (M.D.La.1986) (citations and footnotes omitted)
 
 
 [9]
 The defendant's petition stated in relevant part:
 This action is a civil action of which this Court also has original jurisdiction under 28 U.S.C. Sec. 1332, and is one which may be removed to this Court by the Petitioner pursuant to 28 U.S.C. Sec. 1441(a) in that it is a civil action in which the matter in controversy exceeds the sum or value of Fifty Thousand Dollars exclusive of interest and cost, and is between citizens of different states. The Petitioner is a corporation organized and incorporated under the laws of the State of New York, having its principal place of business in a state other than Kentucky, and is therefore a citizen of a state other than Kentucky. The Respondent is a citizen of the Commonwealth of Kentucky.
 997 F.2d at 163-64 (emphasis added). It was argued that the petition was invalid because, on its face, it failed to specify the state of the petitioner's principal place of business.
 
 
 [10]
 Plaintiff also asserts that the district court should not have ruled on defendants' motion to strike before deciding their motion for summary judgment. This assertion, as defendants correctly point out, is "nonsensical since the Court cannot determine the Motion for Summary Judgment without determining first what materials may be considered."
 
 
 [11]
 Plaintiff asserts that the district court erroneously relied on the term "otherwise handicapped individual" as defined in Bailey v. Tisch, 683 F.Supp. 652 (S.D.Ohio 1988). The standard the court should have applied, according to plaintiff, was that of a "qualified handicapped individual." A person fitting this latter term is one "who can with reasonable accommodation perform the essential functions of the job in question." The key distinction between the above standards is that the former does not expressly take into account the measures taken by the employer. Notwithstanding any apparent discrepancy in the above standards, however, the district court's opinion here did, indeed, contain an analysis of defendants' attempt at accommodating the deceased. As the court concluded: "The evidence before the Court clearly indicates that Manor Healthcare made reasonable efforts to accommodate decedent's handicap, and that even with these reasonable accommodations decedent was not otherwise qualified for the position." (App. 52; footnote omitted.) Plaintiff's argument, therefore, is without merit
 
 
 [12]
 Plaintiff maintains that defendants never acknowledged the decedent's status as a handicapped person entitled to reasonable accommodation. Whether true or not, this assertion is irrelevant for purposes of determining liability under the Rehabilitation Act. So long as defendants provided adequate accommodation, their thoughts (or misconceptions) regarding the true nature of the decedent's ailment are irrelevant
 
 
 [13]
 The decedent's employment with Manor Care was terminable at the will of either party. Notwithstanding this fact, plaintiff argues that defendants failed to fulfill their promise to provide the decedent with the assistance of an LPTA. This promise, plaintiff asserts, effectively altered the terms of the at-will relationship to add rights and obligations that did not previously exist. (See App. at 54-55 ("At-will employment arrangements are most often transformed by company policy, statements in handbooks, and oral and written representations made by management personnel.") (citation omitted))
 
 
 [14]
 Plaintiff argues that defendants were "estopped from discharging decedent based upon [their] promises to provide additional help, not to discriminate based on her handicap, and to follow the disciplinary procedures contained in the employee handbook." (App. 55.)
 
 
 [15]
 As plaintiff alleged in his complaint:
 [A]t the time Defendants made their oral and/or written representations to decedent, Carol Ann Klein, that it would honor their agreements with decedent, Carol Ann Klein; would not discriminate against [her] because of her handicap; and, would reasonably accommodate the same as aforesaid; in actuality said Defendants did not intend to do the same, but rather secretly intended the opposite, and deliberately and maliciously concealed their true intentions from decedent, Carol Ann Klein. In so doing, Defendants acted fraudulently and with malice, in reckless disregard for the rights of the decedent, Carol Ann Klein, all to Plaintiff's damage as aforesaid.
 (App. 24-25.)
 
 
 [16]
 To prevail on such a claim, a plaintiff must establish:
 1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; 2) that the actor's conduct was so extreme and outrageous as to go "beyond all possible bounds of decency" and was such that it can be considered as "utterly intolerable in a civilized community"; 3) that the actor's actions were the proximate cause of plaintiff's psychic injury; and 4) that the mental anguish suffered by plaintiff is serious and of a nature that "no reasonable man could be expected to endure it[.]"
 Pyle v. Pyle, 463 N.E.2d 98, 103 (Ohio Ct.App.1983) (citations omitted).